# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE

Assigned on Briefs September 20, 2016

## STATE OF TENNESSEE v. STEVEN JEFFREY PIKE

**Appeal from the Criminal Court for Knox County**
**No. 97142    Bob R. McGee, Judge**

---

**No.  E2015-02357-CCA-R3-CD – Filed January 25, 2017**

---

The Defendant, Steven Jeffrey Pike, was convicted by a Knox County Criminal Court jury of first degree premeditated murder.  *See* T.C.A. § 39-13-202(a)(1) (2014).   He received a life sentence.  On appeal, he contends that (1) the evidence is insufficient to support his conviction and (2) the trial court erred by admitting his statements to the police.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

J. Liddell Kirk (on appeal) and Gregory P. Isaacs and Andrea Mohr (at trial), Knoxville, Tennessee, for the appellant, Steven Jeffrey Pike.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Charme P. Allen, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the January 15, 2011 killing of Angelo Gradillas, who was beaten to death at the home of Alma Pike, the Defendant's grandmother.

Morgan Savage testified that on January 15, 2011, she lived across the street from Ms. Pike.  She said that she arrived home at about 3:00 a.m., that she heard a door open, and that she saw someone entering Ms. Pike's house.  Ms. Savage stated that she went

upstairs and got into bed and that she heard "a lot of ruckus and yelling." Ms. Savage said that she looked out the window and saw the Defendant yelling and holding a cell phone. Ms. Savage heard the Defendant say, "'N-----, I'm gonna kill you.' And something about you don't do that to a girl, or you don't treat a girl that way."

Ms. Savage testified that she watched the Defendant for a while, that she returned to her bed, and that she heard the Defendant yelling again, possibly a woman's voice, and a car driving away. Ms. Savage said that she looked out the window again and saw a "shadow" pacing at the house. Ms. Savage stated that she thought a woman was driving the car leaving Ms. Pike's house. Ms. Savage said that she had seen the Defendant with his girlfriend at the house previously. Ms. Savage said that she heard a truck without a muffler pass the house two or three times within ten minutes. She stated that when she awoke, police cars were parked outside her house.

On cross-examination, Ms. Savage testified that she thought only the Defendant was home because only two or three cars were parked in the driveway and that she heard cars coming and going that night.

A recording of a 2:27 a.m. 9-1-1 call was played for the jury. In it, an unidentified man told the dispatcher that his friend Angelo "beat the s--- out of me" and that Angelo was beside him. The man told a second man in the background, "You don't do me like that," and the two men argued loudly. The man said, "Look at me, look the f--- at me, dude," and the second man responded, "I didn't do it." The speaker said, "Then who the f--- did it?" The second man responded, "I don't know, you did it, I didn't do it." The man told the dispatcher that he did not require medical attention, that he wanted Angelo to leave, that no weapons were in the house, and that they had been drinking "a little bit." The man began arguing with the second man and told him he was "lucky as f---, I don't give a f--- . . . . Bring all your n------ . . . . I will kill your a---." The second man said that the man was not going to kill him, and the man reiterated that he was going to "kill you, b----." The man told the second man that he got blood on his carpet and that he should leave the man's house. The dispatcher hung up because the man was not responding to questions.

A recording of a 2:46 a.m. 9-1-1 call was played for the jury. In it, the Defendant identified himself and told the dispatcher that Angelo "came over here . . . [and] beat my a--." The Defendant said that he did not need an ambulance and that he wanted Angelo "picked up." The Defendant stated that he wanted to file charges against Angelo, that Angelo had left his location, and that he knew where Angelo lived. The Defendant confirmed that he was at his home and said that he had already reported the assault in a previous 9-1-1 call. The Defendant said that no deputies had responded to his first call

and that he wanted the police to respond more quickly. The Defendant stated that he knew his call was not important because it was "just a fight," that he had been drinking earlier in the evening, and that he did not deserve to be beaten.

A recording of a 3:35 a.m. 9-1-1 call was played for the jury. In it, an unidentified woman, who reported living across the street from Ms. Pike, told the dispatcher that she heard a disturbance involving multiple vehicles in her subdivision. She said that a "truckload" of young men drove down the street and took off their shirts, that the men were driving and walking in the neighborhood's driveways, and that the truck was a "silver-ish" Ford. She said that the young men were leaving the neighborhood and that one of them went into a house across the street from her house. She referenced a group of young men who were "juniors and seniors" and who had previously caused disturbances in the neighborhood.

A recording of an 8:17 a.m. 9-1-1 call was played for the jury. In it, the Defendant identified himself and told the dispatcher without emotion that he was at a Krystal restaurant and requested that the police come to arrest him. When asked why he wanted to turn himself in, the Defendant said that he would rather not discuss it. The dispatcher told the Defendant that the police would not arrest him without an outstanding warrant, and the Defendant responded that he had killed someone earlier in the day. The Defendant told the dispatcher that he was wearing blue jeans covered in blood and a black hooded sweatshirt, that he knew the location of the victim's body, and that he was unarmed.

Knox County Sheriff's Deputy Jeff Monroe testified that about 3:00 a.m. on January 15, 2011, he and another deputy responded to a disturbance complaint at Ms. Pike's house. Deputy Monroe stated that he noticed that the complainant, the Defendant, had a cut over his left eye and a knot on his forehead. The Defendant was intoxicated and told the deputies he and a friend had fought. Deputy Monroe said that although the Defendant initially seemed confused as to why his friend hit him, the Defendant later told the deputies he and his friend liked the same woman. The Defendant refused medical attention and requested to make a report in order to prosecute his friend. Deputy Monroe said that he told the Defendant he could call the deputies the next day when the Defendant was sober, that the Defendant refused to take Deputy Monroe's telephone number and said he would not call back the next day, and that the deputies left. Deputy Monroe stated that the Defendant was "pretty angry" and upset but was polite. Deputy Monroe said that the Defendant understood the deputies' questions and instructions and that he seemed to be aware of what was going on around him.

A video recording from Deputy Monroe's police cruiser camera was played for the jury. The recording depicted the interaction between Deputy Monroe, his partner, and the Defendant and was consistent with Deputy Monroe's testimony. Deputy Monroe testified that he returned to the Defendant's neighborhood around 3:46 a.m. due to a noise complaint from a neighbor and that the neighborhood was quiet. Deputy Monroe said he noticed a silver car in the Defendant's driveway that was not present during his first visit.

On cross-examination, Deputy Monroe agreed that the Defendant was injured when he spoke to the deputies and that the Defendant told them the victim had beaten him. Deputy Monroe acknowledged that he was concerned about the Defendant's being intoxicated. Deputy Monroe agreed that a few minutes after he left the Defendant, a neighbor made a noise complaint about individuals at Ms. Pike's house. Deputy Monroe identified a photograph of a cut on the Defendant's forehead and the photograph was received as an exhibit.

On redirect examination, Deputy Monroe testified that the Defendant was able to open the door for the deputies, that the Defendant refused medical attention, and that the deputies accompanied the Defendant inside to ensure no one else was in the house. Deputy Monroe said that the house was "pretty neat" and that the Defendant characterized the person who hit him as his friend. Deputy Monroe said that he did not have a reason to think the Defendant and the victim were in a romantic relationship. Deputy Monroe stated that he did not feel the Defendant was in danger because he told the deputies the victim had left the area. Deputy Monroe said that the Defendant never expressed fear to the deputies. Deputy Monroe stated that when he returned to the neighborhood, he was there to determine whether several males in a silver truck were screaming and yelling as they drove through the neighborhood. He said that when he arrived, the neighborhood was quiet and that he did not think he needed to knock on the Defendant's door.

Knox County Sheriff's Deputy Roger Morgan testified that he went to a Krystal restaurant around 8:24 a.m. in response to the Defendant's 9-1-1 call in which he said he had killed someone and wanted to surrender himself. Deputy Morgan said that when he arrived, the Defendant stood in a grassy area beside the parking lot, that the Defendant wore blue jeans, a black hooded sweatshirt, and tennis shoes, and that the Defendant's blue jeans and shoes were covered in blood. Deputy Morgan stated that Deputy Capley restrained the Defendant, that the Defendant was cooperative, and that the Defendant's demeanor was calm. Deputy Morgan said that the Defendant appeared to understand the deputies' questions and did not appear intoxicated. Deputy Morgan stated that he spent between fifteen and twenty minutes with the Defendant before driving the Defendant to

Ms. Pike's house. Deputy Morgan said that the Defendant cried "a little bit" when they left Krystal but otherwise remained calm.

Deputy Morgan identified four photographs of the Defendant and the clothing he wore at the time of his arrest. The Defendant's blue jeans and his shoes were heavily splattered with blood. The Defendant had a cut on the left side of his forehead and a few small scratches on his hands. Deputy Morgan testified that the Krystal restaurant to which he responded was about one mile from Ms. Pike's house.

Knox County Sheriff's Deputy Chad Capley testified that he responded to Krystal with Deputy Morgan. Deputy Capley said that when the deputies arrived, the Defendant stood under a sign, that the Defendant turned his back to the deputies and put his hands in the air, and that the Defendant had a "significant amount of blood" on his clothing. Deputy Capley stated that he asked the Defendant if he was injured, that the Defendant said the blood was not his, and that the deputies handcuffed the Defendant and "Mirandized him at that time." Deputy Capley said that the Defendant had a visible head injury and was calm, although "he was a little reluctant . . . [and] didn't want to tell us what he had done." Deputy Capley stated that the Defendant was placed in Deputy Morgan's car, that the deputies met with their supervisors, and that the group went to Ms. Pike's house. Deputy Capley said that Deputies Morgan and Sharp went inside the house while Deputy Capley supervised the Defendant. Deputy Capley stated that the Defendant did not cause any trouble.

Joseph Merrell testified that he considered the victim to be his best friend, that he had known the victim for ten years, and that he met the Defendant on the night before the victim's death. Mr. Merrell said that he picked up the victim around 4:00 p.m., that they planned to go to the Southbound nightclub later in the evening, that they shopped and ate dinner, that Mr. Merrell drove his mother's silver Kia Rio, and that while they were at a restaurant, the victim spoke to the Defendant on the telephone. Mr. Merrell stated that the Defendant "very adamantly said . . . my grandma's out of town, we could all crash [at her house] and hang out[.]" Mr. Merrell said that at about 9:30 p.m., he, the victim, and another friend, later identified as Jordan Kuzne, drove to Ms. Pike's house and that Mr. Kuzne drove a truck. Mr. Merrell stated that he, the victim, the Defendant, Mr. Kuzne, and Blake Wallace "hung out and drank a little bit," that they left and went to Brittany Covington's apartment, and that they went to Southbound. Mr. Merrell stated that about 11:30 p.m., he became separated from the victim and the Defendant, that the victim had Mr. Merrell's car keys, that the victim and the Defendant left without him, and that Mr. Merrell, Mr. Kuzne, and Mr. Wallace obtained a ride to "the strip," where the three men went to two other bars and looked for a ride to Ms. Pike's house. Mr. Merrell later said that the victim and the Defendant left Southbound about 2:00 a.m. Mr. Merrell noted that

it was not unusual for the victim to drive Mr. Merrell's car. Mr. Merrell said that they rode to Ms. Pike's house in the bed of a man's white Ford pickup truck around 3:30 a.m. Mr. Merrell stated that the truck was noisy. He said that the driver of the truck dropped off the men and "peeled out and left."

Mr. Merrell testified that when they arrived, the house was as they had left it and that the Defendant and the victim were present. Mr. Merrell said that "the night was pretty much over," that the men prepared to go to sleep, that he and Mr. Wallace decided to stay the night at Mr. Wallace's house, and that the group, apart from the Defendant, acted normal. Mr. Merrell stated that the Defendant had a "big knot on his head," that "they" had already been in a fight, and that the Defendant was adamant that Mr. Merrell and Mr. Wallace leave and the victim stay because the victim had plans to meet the victim's girlfriend in the morning. Mr. Merrell said that the Defendant put his hands on Mr. Merrell's and Mr. Wallace's shoulders and separated them from the victim, that the men could not talk to the victim about why he and the Defendant fought, and that the Defendant said, "He busted my head. We're friends. It's no big deal." Mr. Merrell stated that he asked the Defendant two or three times whether the Defendant and the victim would fight if he and Mr. Wallace left and that the Defendant assured Mr. Merrell they would not fight. Mr. Merrell said that the Defendant "was very normal about it. He was just very cool and collected . . . and just wanting me and [Mr. Wallace] to leave." Mr. Merrell stated that at the last moment, the victim decided to stay because his girlfriend planned to pick up the victim from Ms. Pike's house.

Mr. Merrell testified that when he left the house, the Defendant did not seem intoxicated "past the point to where he was slurring his words . . . or stumbling or anything like that . . . . [He] did not seem to be completely inebriated or intoxicated at that time. He was not any more intoxicated than anybody else." When asked whether the Defendant seemed angry, Mr. Merrell said, "Not at all, which was very weird and just did not seem right . . . he didn't seem angry, but he was very loud and he continued to not want [the victim ] to speak . . . . [It] was a very weird, eerie feeling[.]" Mr. Merrell stated that the victim did not indicate he wanted to talk to Mr. Merrell and that the victim "seemed like he was trying to hide it, whatever had happened . . . because [the Defendant] would not give him the space for him to be able to speak to us to tell us what had happened." Mr. Merrell said that the victim did not have a car or a cell phone.

Mr. Merrell testified that to his knowledge, the victim and the Defendant were acquaintances but were not "good friends." Mr. Merrell said that the victim's girlfriend was pregnant and that the victim dated multiple women simultaneously. Mr. Merrell stated that the victim's demeanor was normal when they were at Southbound and that when the victim was at Ms. Pike's house, he was quiet and calm but acted uneasy. Mr.

Merrell said that the victim stated he was going to sleep and that the victim walked Mr. Merrell and Mr. Wallace to the door. Mr. Merrell agreed that the victim shaved his body hair and said the victim was "metrosexual." Mr. Merrell denied that the victim was homosexual and said that the victim was not homophobic.

On cross-examination, Mr. Merrell testified that the victim would often "crash" with various friends, including Mr. Merrell. Mr. Merrell stated that when he arrived at Ms. Pike's house, he drove the group to a liquor store, that he bought a "handle" of vodka and a "large magnum" of wine, and that the group drank moderately. Mr. Merrell did not see anyone drinking at Ms. Covington's house. Mr. Merrell agreed that he, the Defendant, and the victim drank vodka and that Mr. Merrell smoked marijuana. Mr. Merrell said that the victim acted normal and that he did not notice the victim's being especially intoxicated. Mr. Merrell acknowledged that he continued drinking at Southbound and at the other bars he visited. Mr. Merrell estimated that he had about ten drinks over the course of six hours and said that for him, it was a moderate night of drinking.

Mr. Merrell testified that he remembered the night's events in spite of his drinking and that he thought the victim "was definitely [with]holding information from us." Mr. Merrell stated that he had heard the recording of the Defendant's first 9-1-1 call and that he recognized the victim's voice in the background. Mr. Merrell said that when he returned to the house, the Defendant was less intoxicated than he was in the 9-1-1 recording. Mr. Merrell maintained that he did not consider the Defendant intoxicated because he did not stumble or slur his words, although Mr. Merrell later said that the Defendant was not sober. Mr. Merrell stated that the Defendant told him the victim had "busted my head" a few times.

Mr. Merrell testified that he and Mr. Wallace were not permitted to talk to the victim and denied that the victim expressed fear of being arrested because the Defendant called the police. Mr. Merrell said that the victim and the Defendant never told Mr. Merrell and Mr. Wallace about the argument or about the 9-1-1 calls. Mr. Merrell denied that his intoxication affected his perception of the Defendant's level of intoxication.

Mr. Merrell testified that he, the victim, and all of their friends shaved their body hair. Mr. Merrell said that there was "very little" of the victim's life of which he was not aware. Mr. Merrell denied that he was equally or more intoxicated than anyone in the group. On redirect examination, Mr. Merrell said that on the evening of January 14, the victim drank an average amount of alcohol based upon his usual habits.

-7-

Blake Wallace testified that he considered the victim to be his best friend, that he had known the victim for six or eight years, and that although Mr. Wallace had seen the Defendant previously, he did not know him personally. Mr. Wallace said that he saw Mr. Merrell at Southbound, that he and Mr. Merrell were good friends, and that Mr. Wallace saw the victim come in briefly and leave. Mr. Wallace said that a friend gave them a ride to another bar between 12:30 a.m. and 1:30 a.m. Mr. Wallace stated that the friend left and that he, Mr. Merrell, and two other men obtained a ride to Ms. Pike's house with some "bar friends" in a large red truck. Mr. Wallace did not remember whether Jordan Kuzne rode with them.

Mr. Wallace testified that when they arrived at Ms. Pike's house, the Defendant met them outside, that the Defendant was shirtless and had a gash over his eye, and that the Defendant said he and the victim "got into a scuffle." Mr. Wallace said that he asked the Defendant, "[A]re you all cool," and that the Defendant told him everything was fine. Mr. Wallace stated that he went into the house and asked the victim whether he punched the Defendant and that the victim said he punched the Defendant because the Defendant "kept like poking him . . . when he was asleep[.]" Mr. Wallace said that no one seemed angry and that he thought everything was all right. Mr. Wallace stated that after about an hour, he and Mr. Merrell left together, that the victim and the Defendant were not arguing or angry, and that Mr. Wallace felt comfortable leaving the victim there.

Mr. Wallace testified that although the group had been drinking, none of them were "extremely intoxicated," and that they drank almost every weekend. He said that the Defendant was able to understand what was happening, that the Defendant knew Mr. Wallace's name, that the Defendant was not stumbling, and that the victim also acted normal.

On cross-examination, Mr. Wallace testified that he arrived at Southbound around 11:30 p.m. and that he did not drink before he arrived. Mr. Wallace denied that his memory was hazy or foggy, although he said that his memory was not as good as it was on the date of the incident. Mr. Wallace stated that he was at Southbound for no more than two hours and that he briefly saw the victim between 12:15 and 12:30 a.m. Mr. Wallace agreed that the victim drank heavily and that it was apparent the victim had been drinking. Mr. Wallace said, though, that the victim drank every day, that the victim had a high alcohol tolerance, and that Mr. Wallace had never seen the victim extremely intoxicated, vomiting, or unconscious as a result of drinking. Mr. Wallace agreed that he saw Mr. Merrell but denied that Mr. Merrell appeared intoxicated. Mr. Wallace said that he drank beer at Southbound and that he did not see Mr. Merrell drink there. Mr. Wallace stated that he did not see the Defendant until he arrived at Ms. Pike's house. Mr. Wallace said that after he left Southbound, he did not accompany the group to another

bar. Mr. Wallace stated that the bars closed at 3:00 a.m. and that he went to Ms. Pike's house between 3:00 and 4:00 a.m.

Mr. Wallace testified that everyone at the house acted normal and seemed "kind of sober . . . it was just kind of one of those nights." Mr. Wallace said that he felt sober and thought he could have driven. Mr. Wallace stated that the victim did not appear to be intoxicated. Mr. Wallace remembered telling a police officer that the Defendant acted "the most intoxicated, but he was just acting weird all the way around. He was . . . patting [the victim] on the leg . . . getting all close to him and s---, that stuff normal guys don't do[.]" Mr. Wallace said, though, that he would not say the Defendant was the most intoxicated person in the room and that he saw the Defendant as "the strangest and doing things that I'm normally not used to doing[.]" Mr. Wallace denied that he characterized the Defendant's actions as affectionate and said that he characterized the actions as "homosexual." Mr. Wallace recalled telling the police that he speculated the cause of the fight between the Defendant and the victim was that the Defendant made a sexual advance toward the victim. Mr. Wallace stated that when he lived with another man, the victim stayed overnight once and that Mr. Wallace had never seen the Defendant at the man's house. Mr. Wallace said that he told the police about an incident two years before the victim's death in which "a guy [at a bar] slapped [the victim] on the a--." Mr. Wallace said that the victim hit the man and that the only time Mr. Wallace saw the victim fight was when a man made a sexual advance toward him.

On redirect examination, Mr. Wallace testified that at Ms. Pike's house, the victim did not appear angry when the Defendant touched him. Mr. Wallace stated that "everybody was being friends" and that no one was arguing when he left the house.

Ashley Maner testified that she had previous romantic relationships with the Defendant and the victim, that she remained friendly with both men, and that she believed the men were friends. Ms. Maner estimated that the victim and the Defendant had known each other between six and eight months before the victim's death. Ms. Maner said that on the evening of January 14, she went to Southbound and that she saw the victim and the Defendant together. She stated that she spoke briefly with the victim, that their conversation was friendly, and that the victim and the Defendant seemed to be having a good time. Ms. Maner agreed that the men appeared to have been drinking, that they were coherent, and that they behaved normally.

Ms. Maner testified that when she arrived home around 3:30 a.m., she returned a call from the Defendant and that she thought the victim answered. She said that the conversation was friendly until suddenly, the victim called her a "whore." Ms. Maner stated that she thought he referred to her relationship with the Defendant, that she told the

victim she wanted to speak to the Defendant, that the victim handed the telephone to the Defendant, that the Defendant asked her if everything was okay, and that she told the Defendant everything was fine. Ms. Maner said that at one point, Mr. Wallace was handed the telephone and said hello. She stated that the conversation lasted about fifteen minutes and that she heard music and male voices in the background. She said that it sounded as though the men were having a party and a good time. Ms. Maner denied that the victim and the Defendant argued or sounded angry. Ms. Maner said that "at some point" in the early morning, the victim stopped by her house when she was not there and that she thought he wanted to stay overnight with her. Ms. Maner stated that her friend was at the house with Ms. Maner's daughter and that Ms. Maner did not know whether the victim was alone when he came to her house. Ms. Maner said that the victim did not own a car or a cell phone and that she did not know how he traveled to her house. Ms. Maner denied the victim was homosexual.

On cross-examination, Ms. Maner testified that her romantic relationship with the Defendant occurred "recently" before the victim's death. Ms. Maner said that she was aware the Defendant and the victim were roommates for an unknown period of time. Ms. Maner agreed that the Defendant and the victim talked frequently, were friendly, liked to drink alcohol, and "looked out for each other as friends would[.]" Ms. Maner stated that although she and the Defendant were physically intimate for a time, they were not "dating," and that after she and the Defendant ended their relationship, she started dating the victim. Ms. Maner said that she knew the victim well, that she knew he had another girlfriend who was pregnant with his child, and that if the victim had been homosexual or bisexual, he would have told Ms. Maner.

Ms. Maner testified that the victim was upset during the telephone conversation and said that although she knew he and the Defendant had been drinking, they did not sound intoxicated. Ms. Maner said that the Defendant invited her to Ms. Pike's house during the telephone conversation and that she did not get the impression the Defendant wanted the other people at the house to leave. Ms. Maner agreed that if the Defendant told someone he and the victim fought over a woman that night, she would have assumed she was the woman. On redirect examination, Ms. Maner said that when the Defendant invited her to his house, he told her he was having a party, that she told him she had to work the next morning, and that the conversation ended shortly thereafter.

Jordan Kuzne testified that he attended high school with the Defendant and that he knew the victim through a mutual friend, although he was not close with either man. Mr. Kuzne said that on January 14, he met the victim and Mr. Merrell at a restaurant for dinner and that they went to Southbound later in the evening. Mr. Kuzne denied drinking alcohol that evening and seeing anyone else drinking, although he acknowledged it was

possible they were drinking. Mr. Kuzne said that his maroon truck was parked at Ms. Pike's house and that he rode back to Ms. Pike's house in a "lifted jacked up truck," which he thought was white. Mr. Kuzne stated that they were alone when he, Mr. Merrell, and possibly Mr. Wallace arrived at Ms. Pike's house and that the victim and the Defendant arrived in a car about two minutes later. Mr. Kuzne said that the Defendant was not wearing a shirt and had a lump on his head. Mr. Kuzne said that the Defendant may have been intoxicated but was able to communicate and stand up. Mr. Kuzne stated the Defendant told them "at the very beginning" that the house did not belong to the Defendant and that he did not want a "ruckus in his house to make the neighbors upset." Mr. Kuzne said that the Defendant "tried to say" the victim caused his injury. Mr. Kuzne stated that once everyone returned to Ms. Pike's house, the men had a push-up contest and were "goofing around," that they spent time on a computer, that everyone was friendly, and that when Mr. Kuzne left around 4:00 a.m., everything seemed fine and no one was upset. Mr. Kuzne said that he was the first to leave.

Brittany Covington testified that the Defendant, the victim, Mr. Kuzne, and Mr. Merrell visited her apartment on January 14, that they spent between one and two hours there, that it was a pleasant visit without disagreements between the men, that the men drank alcohol and smoked marijuana, and that the men left around 11:00 p.m. Ms. Covington said that they asked her to accompany them and that she declined and stayed home. Ms. Covington stated that she received a telephone call around 2:00 or 3:00 a.m. from the Defendant or the victim, that she spoke to the victim, that the victim wanted to stay overnight at her apartment, and that she declined because she was going to bed. Ms. Covington said that she did not hear from the victim or the Defendant after this call. Ms. Covington stated that she considered the victim and the Defendant acquaintances, that she had known both of them for about three months, and that she was not in a romantic relationship with either man.

On cross-examination, Ms. Covington testified that the men arrived between 8:00 and 9:00 p.m. She denied that the group was "partying hard" and said that they played cards. Ms. Covington denied ever seeing the Defendant be violent or act inappropriate with her or others. Ms. Covington agreed that the Defendant was polite and soft-spoken.

Knox County Sheriff's Sergeant McKenzie Alleman testified that she responded to Ms. Pike's house and that Lieutenant Brad Park and Captain Terry Lee assisted her in processing the crime scene. Sergeant Alleman identified photographs of Ms. Pike's house, which were received as exhibits. The photographs showed the exterior of the house, an overturned potted plant beside the front door, overturned living room furniture and many items on top of or near a sofa, and living room walls with blood spatter. A bloodstained human arm was visible protruding from beneath the items on the sofa. The

photographs depicted the victim's body on the sofa, partially wrapped in a comforter and covered with various household items. A large amount of blood was visible around the victim's head and on the sofa. Blood spatter and bloody footprints were present on the living room carpet. White shards of an unidentified material and a large amount of blood were present on the carpet near the victim's head. A bloody shoeprint was present on the cover of a magazine. The interior of a red cooler located beside the sofa was coated in blood and sediment. One photograph depicted a large dumbbell covered in blood. Other photographs showed the dining room and kitchen, which were in similar states of disarray, and a bloodstained bathroom sink faucet handle. Additional photographs showed blood smeared on the exterior of a door, a pair of bloodstained blue jeans with a cell phone, wallet, and the Defendant's driver's license, and a second pair of blue jeans with a white belt, a gray necktie, a men's shirt, and tennis shoes. Photographs of the driveway showed tire tracks and shoeprints in patches of snow.

Sergeant Alleman testified that the victim was wrapped in a comforter. She stated that bloody shoeprints were found throughout the house and on papers on the floor. Sergeant Alleman said that the blood-covered dumbbell weighed twenty pounds. She noted that in areas other than the bedding on the sofa, which was saturated with blood, the blood had dried. She stated that a pillow was present on top of the victim's legs and that the underside of the pillow was saturated with blood. She said that she did not see any injuries to the victim below his chest and that no injuries corresponded to the blood-soaked pillow that was found on top of his legs. Sergeant Alleman stated that blood had permeated through the comforter and the sofa and had dripped onto the floor.

Sergeant Alleman testified that no windows were broken in the house. She said that swabs of the blood in the house matched the victim, with the exception of blood found on the door between the kitchen and the garage, which matched the Defendant. She stated that a pair of ripped boxer shorts wrapped around a set of artificial flowers was collected as evidence and that the shorts had a shoe impression on them. She said that the victim was found wearing a white shirt, lime green boxer briefs, and ankle socks. Sergeant Alleman stated that the shoeprints found throughout the house had the same "zigzag" tread. She said that a bloodstained t-shirt was collected from one of the bedrooms. She stated that the cooler contained blood and smelled like vomit. She said that red gel candles were broken near the victim's head and that shards of a white ceramic candle holder were found near the body. Sergeant Alleman stated that two barbells were found near the victim's head in the "void" at the corner of the reclining sofa.

Sergeant Alleman identified a twenty-pound dumbbell recovered from the floor in front of the sofa, a twelve-pound dumbbell recovered near the victim's head on the sofa, and a twenty-pound dumbbell and a twelve-pound dumbbell recovered from under the

victim's head. She said that the dumbbells had reddish-brown stains when she collected them. Sergeant Alleman identified items found under the overturned coffee table, including a pair of blue jeans with a white belt, two cell phones, and a wallet. She stated that the wallet contained the victim's identification. She said that the blue jeans had reddish-brown stains on the front left leg and that they had not been neatly placed on the floor. She also identified a pair of red and white Nike tennis shoes found near the victim's clothing. Sergeant Alleman identified a pair of blue jeans with a brown belt, a wallet, loose change, and a key from the floor in front of a loveseat. She said that the wallet contained the Defendant's identification and that both sides of the blue jeans had reddish brown stains. Sergeant Alleman identified a gray button-up shirt and a gray thermal shirt, which were found on the floor in front of the sofa.

Sergeant Alleman identified a pair of boxer shorts recovered from the hallway and noted a "zigzag pattern" present on the boxer shorts that matched bloodstains found throughout the house. She also identified a gray shirt recovered from the back bedroom three days after the police initially searched the house. She stated that the shirt had reddish-brown stains on the shoulders, on the lower side, and on the back. Sergeant Alleman identified drug paraphernalia recovered from a night stand, including a broken glass pipe, a metal pin, a portion of an ink pen, plastic wrap, and aluminum foil.

Sergeant Alleman identified DNA swabs taken from blood spatter on the living room walls, the headrest on the sofa, the wall behind the front door, the bathroom door, and the door between the kitchen and the garage. She said that the swabs were sent to the Tennessee Bureau of Investigation (TBI) for analysis. She also identified eight pieces of paper with bloody shoeprints, which were recovered inside the house. She noted that the shoeprints all had the same zigzag pattern.

Sergeant Alleman identified a pair of Nike tennis shoes, a tie, a "face warmer," a "hood," a pair of blue jeans, a pair of socks, and a jacket taken from the Defendant after his arrest. Sergeant Alleman said that the jacket had reddish-brown stains on the rear left shoulder and that the blue jeans had "substantial staining" on the front and rear sides. She also identified a shirt taken from the victim. Sergeant Alleman noted that the shirt had significant amounts of bloodstains and footprints with a zigzag pattern on the center and right shoulder. Sergeant Alleman identified an air purifier heater that was recovered from the hallway entrance, which was broken into several pieces and covered with a reddish-brown stain.

Sergeant Alleman testified that she collected several ceramic and glass fragments from around the victim's head, that the victim was transported to the hospital wrapped in the comforter, and that the medical examiner recovered ceramic and glass fragments from

inside the comforter. Sergeant Alleman said that bloodstains on the comforter were concentrated on the area near the victim's head and shoulders.

On cross-examination, Sergeant Alleman testified that the victim was dressed in a white t-shirt, boxer briefs, and ankle socks and that due to the location of the victim's blood and his being wrapped in the comforter, the victim did not appear to have been moved. She agreed that blood was present on a door about twenty feet from the sofa. Sergeant Alleman agreed that the blood on the door matched the Defendant's blood sample and that the victim's hand was swollen and had blood on it.

Sergeant Alleman testified that the house was an unusual crime scene, that she had never seen "debris and the objects fashioned in that manner," and that the house contained a variety of household objects "just piled in the middle of the room." She agreed that the Defendant's jeans contained bloodstains running down from the waistband, that a sweatshirt found near the sofa had a "limited stain" on the side, and that a grey shirt found near the sweatshirt was not bloodstained. She said that the boxer shorts found at the entrance to the bathroom had been "significantly ripped" at the front center waistband and horizontally across the front of the thighs on both sides. Sergeant Alleman agreed that the Defendant was not wearing underwear when he was arrested. On redirect examination, Sergeant Alleman said that nothing about the crime scene indicated objects had been moved after the victim was attacked, other than the blood-soaked sham pillow on the victim's legs.

TBI Special Agent Linda Littlejohn, an expert in forensic impression evidence, testified that she analyzed the Defendant's tennis shoes and the victim's t-shirt, that she found two partial shoeprints on the shirt, and that the shoeprints matched the Defendant's shoes.

TBI Crime Lab Agent Dr. Laura Boos, an expert in forensic biology, testified that she performed tests to determine the presence of blood and DNA on items from the house. Dr. Boos said that she tested the dumbbell found in front of the sofa, the Defendant's tennis shoes, the Defendant's jacket and blue jeans, the victim's t-shirt, and the victim's fingernail clippings, and that all the items were positive for the victim's blood. She stated the victim's DNA was found on swabs taken from the walls, sofa, and bathroom door. She said that the Defendant's blood and DNA were found on a swab taken from the door between the kitchen and the garage.

Dr. Boos testified that anal swabs taken from the victim tested positive for the presence of semen, but not sperm cells, and that no DNA profile other than the victim's was obtained from the swabs. She said that sometimes semen was void of sperm cells

because of a vasectomy or because a period of time had passed such that any sperm cells had degraded. Dr. Boos said that in the absence of an additional DNA profile with which to compare the sample, she could not exclude the possibility that the semen on the anal swab belonged to the victim. She stated that in her experience, it was possible for a victim's DNA profile to "overwhelm" another DNA sample due to the presence of the victim's DNA on a swab.

Knox County Sheriff's Detective Krystal Gibson testified that she was the lead detective at the crime scene and that she interviewed the Defendant. She said that the Defendant was in a police cruiser, that he was calm and polite, that he was disheveled, that "a lot of blood" was on his clothing, that he used a necktie as a belt, and that he had a cut on his head. Detective Gibson denied that the Defendant smelled of alcohol. She said that she interviewed the Defendant between forty-five and sixty minutes, that he understood and answered her questions, that he clarified his answers when necessary, and that he gave her directions and information to assist the investigation. Detective Gibson stated that Detective Cowan also participated in the interview.

Detective Gibson testified that the Defendant became uncomfortable with being seen by neighbors and was embarrassed on his grandmother's behalf and that, as a result, the deputies moved the police cruiser from the street to the driveway. Detective Gibson said that the Defendant was handcuffed for safety reasons, that the police cruiser's door was open during the interview, and that the Defendant remained in the police cruiser, with the exception of stepping outside to allow the police to take his photograph. Detective Gibson denied that the Defendant complained about the cut on his head.

Detective Gibson testified that she read the Defendant his constitutional rights and that he did not sign the waiver form because he was handcuffed. Detective Gibson said that the Defendant was willing to speak to her at the scene and that she audio recorded the conversation. A waiver of rights form was received as an exhibit. The form contained a handwritten notation reading, "K. Gibson read to Δ 1.15.11 Apx. 0905. Read to Δ outside of 10-62 location. Δ in Rear of Cruiser. Also present (Lt. Cowan)." The form reflected that the Defendant had a twelfth-grade education and was literate.

An audio recording of the interview was played for the jury. In it, Detective Gibson asked the Defendant if he understood his rights and he replied affirmatively. When asked if he was willing to talk to Detective Gibson, the Defendant answered, "[B]riefly." Detectives Gibson and Cowan discussed interviewing the Defendant with the police cruiser's door open, and the Defendant asked if they could leave the area. Detective Cowan replied that they would "get [the Defendant] out of here just as quick as we can" and asked the Defendant if he understood his rights. The Defendant said, "Yes

-15-

sir." When asked what happened, the Defendant said that "me and the gentleman inside and two other people" went out and were drinking alcohol, and then "you see the mark on my face? The bump . . . . He apparently . . . hit me a couple times." The Defendant said that he believed the victim hit him at Ms. Pike's house. The Defendant did not remember where the group went and said that he thought it was in "the Old City" or "the strip." When asked about the police's coming to Ms. Pike's house earlier in the morning, the Defendant responded that the police had not come to the house "that I know of." The Defendant asked Detective Cowan if the police had come to the house, and Detective Cowan responded that his information indicated deputies had received a "domestic" call. When asked whether the Defendant lived at Ms. Pike's house, the Defendant said that he and his grandmother lived there. The Defendant identified the victim as "Angelo," although he noted that the victim's "real name" was Angel. The Defendant thought the victim's last name was Ratliff, although he was not sure. When asked how he knew the victim, the Defendant responded that he was a friend the Defendant had met through mutual friends about six months previously.

Relative to his conflict with the victim, the Defendant said that he and the victim "got into it" at the house and that the victim hit him. The Defendant said that the victim left the house, returned, and went to sleep, "and I did what I did." When asked what the Defendant meant when he said "I did what I did," the Defendant said that he threw a twenty-pound dumbbell at the victim's head, that the dumbbell was the first object he threw, and that he thought the dumbbell killed the victim. The Defendant said that the victim was asleep on the couch and that he killed the victim because the victim beat him up. When asked whether the Defendant left the house after the victim went to sleep, the Defendant responded that it was his house and that he stayed there. The Defendant said that neither he nor the victim owned a car.

When asked whether the Defendant and the victim had a romantic or sexual relationship, the Defendant repeatedly stated that they had not. The Defendant said that the victim was just visiting and did not live at Ms. Pike's house. The Defendant stated that he wanted to leave the area because the neighbors were "so nosy" and that he was concerned for Ms. Pike because "she has to live here" and because everyone would know what happened. The Defendant began to cry and said he felt bad for her. When asked where Ms. Pike was, the Defendant said that she was babysitting for the Defendant's younger siblings and that she was not present during the incident.

The Defendant stated that the victim lived in a condominium, that his mother lived with him most of the time, and that the victim's mother's cell phone number was possibly in the Defendant's cell phone call history. The Defendant said that the victim was age twenty-seven or twenty-eight and that the Defendant was age twenty-four. The

Defendant denied having taken anything out of the house and said that he "made a wreck out of the house." The Defendant said, "This is not me. I'm not a f------ killer . . . . I was just so upset, just so distraught." The Defendant stated that he hit the victim "numerous times" with different objects, starting with the dumbbell. The Defendant said that the dumbbells had been in the living room beside the television. The Defendant noted that he was "in a rage." When asked when it happened, the Defendant said that he did not know but that it was very late the previous night or early that morning around 3:00 a.m. The Defendant did not remember whether he stayed in the house after he killed the victim. He said that he remembered thinking he could not stay there, that he walked to Krystal, and that he used the restaurant's telephone to call the police and surrender himself. The Defendant began to cry.

Detective Cowan said that he was going to move the police cruiser into the driveway where the Defendant was not as visible. The Defendant said that his friends, Jordan and Joey, went out with him the previous night, that their telephone numbers were in his cell phone call history, and that the Defendant's cell phone was inside the house. He stated that he did not "mind" if Detective Gibson searched his cell phone. The Defendant said that he could not find the cell phone and that the house was "a mess."

The Defendant said that he and the victim had "not really" had problems before the previous night and that they had never fought. The Defendant stated that they were both intoxicated at the time of the fight, that they were "just drunk and being stupid," and that the victim punched him for an unknown reason. He denied that he and the victim used drugs and said that he drank vodka. The Defendant said that the victim left, that the Defendant did not know where the victim went, and that the victim had the Defendant's cell phone. The Defendant remembered calling his cell phone, telling the victim that he did not care about the fight, and asking the victim to return to the house. The Defendant said that when he spoke with the victim on the telephone, the Defendant did not have any intent to kill the victim. The Defendant stated that he had a bad temper and that he was upset with the victim. When asked whether the Defendant would "get back" at people who upset him, the Defendant said, "Yeah, pretty much, I guess." The Defendant said that although he was angry with the victim before the victim went to sleep, the Defendant did not show it. The Defendant remembered mentioning the fight to the victim repeatedly. The Defendant said that he "went crazy" inside the house. The Defendant did not remember which shirt he wore during the attack.

When asked how he knew the victim had died, the Defendant responded, "I mean, I like, I made sh—. . . I killed him . . . . I threw a dumbbell right through his head." When Detective Cowan asked the Defendant whether he was speaking to them of his own

free will, the Defendant answered that he was and that Detective Gibson read him his rights.

When asked whether he intended to kill the victim when he initially threw the dumbbell, the Defendant responded, "Yes. Yes. I mean . . . I was mad because he beat me up . . . . I was bleeding, and I don't play games like that." The Defendant did not remember if the victim hit him with his hands or with an object, whether anyone else was present, or when the fight happened. The Defendant said that he did not remember because he was intoxicated at the time. The Defendant said that the group drove Mr. Merrell's Kia and that he did not know if the police could have spoken to another member of the group when they responded to the assault call. The Defendant did not remember if he intended to sleep on the loveseat. The Defendant identified his cell phone and said that when he walked to Krystal, he left a voicemail message for his girlfriend. He said that in the message, he told her he loved her and that he was going away for a long time.

The Defendant stated that earlier in the evening, he ate dinner at a restaurant with a friend and his mother, that the friend's mother dropped off the Defendant after dinner, that Mr. Merrell, Mr. Kunze, and the victim joined him, and that the four men went to Ms. Covington's house. The Defendant did not remember calling a woman identified as Ashley and said that after they left Ms. Covington's house, everything was "a daze." He did not remember walking in front of the house and talking on the telephone. He said that Mr. Kuzne's truck did not have a loud muffler.

Detective Gibson testified that the Defendant gave her his cell phone, that his call log corroborated his statement, and that the call log reflected several calls from Ms. Pike's house to his cell phone after the 2:27 a.m. 9-1-1 call but before 4:00 a.m. Detective Gibson said that based upon her investigation, the victim was killed between 4:00 a.m. and 5:37 a.m., when the Defendant called his girlfriend and left her a voicemail message saying that he had killed someone. Detective Gibson stated that according to the Defendant's jail intake records, he was not sent to the hospital after booking, that the Defendant reported a head injury, and that the Defendant reported drinking alcohol and using marijuana the previous day.

On cross-examination, Detective Gibson testified that the Defendant had walked one mile from Ms. Pike's house to Krystal. She agreed that the Defendant openly stated he was involved in a homicide and that the Defendant had a large "pump knot" on his forehead, indicating he had been involved in a struggle. She agreed that the Defendant was compliant and agreed to speak to her after being read his *Miranda* rights.

-18-

Detective Gibson testified that the Defendant did not "appear too impaired to talk to me" at the time of the interview. She agreed that the Defendant did not remember a "big chunk" of what happened and that she decided to proceed with the interview. She agreed that the Defendant was unsure about his memory of the initial altercation with the victim and said that she was not concerned by the Defendant's memory lapse. When asked whether the Defendant's statement about the victim's leaving the house, returning, and going to sleep was consistent with Mr. Wallace's and Mr. Merrell's statements about the victim's and the Defendant's returning to the house together at 3:40 a.m., Detective Gibson said that Mr. Wallace and Mr. Merrell stated that the Defendant was on the lawn shirtless and that the victim had pulled up in Mr. Merrell's car. Detective Gibson agreed that the Defendant did not mention going somewhere with the victim after the initial altercation and that there was a "significant and material" discrepancy between the Defendant's and the witnesses' statements.

Detective Gibson agreed that the Defendant stated he killed the victim around 3:00 a.m., which was untrue, and that the Defendant did not remember the cause of his fight with the victim or what happened between his killing the victim and his walking to Krystal. Detective Gibson agreed that the Defendant admitted he and the victim were intoxicated and that when Detective Cowan asked the Defendant if he intended to kill the victim when he threw the barbell, the Defendant answered, "Yes, I mean," and that Detective Cowan interrupted him before he could finish the thought. She disagreed that it would have been a good idea to stop the interview due to the Defendant's memory lapses and head injury and denied that the Defendant's statements were unreliable due to his memory lapses. Detective Gibson said that she thought the Defendant "was remembering what was convenient" in his statement, although she acknowledged nobody could know what was happening in the Defendant's mind.

On redirect examination, Detective Gibson testified that the Defendant remembered "hanging out" with a group of people, drinking alcohol, having a problem with the victim, the victim's "real name," the victim's leaving, returning, and going to sleep, and the Defendant's killing the victim. Detective Gibson said that according to a witness interview, the victim knocked on the witness's door late at night, which indicated that he left Ms. Pike's house after the fight. Detective Gibson stated that the Defendant's cell phone call history also corroborated the victim's having left the house. She said that the Defendant remembered calling the victim, who had the Defendant's cell phone, to ask the victim to return to the house. She stated that the victim was dressed as if he were prepared to sleep, was covered with a comforter, and had a pillow. Detective Gibson stated that the Defendant consistently identified the victim's punching him as the reason he killed the victim and that the Defendant remembered what he threw at the victim. Detective Gibson said that the Defendant remembered his age and Ms. Pike's not being at

home because she was babysitting. Detective Gibson stated that the Defendant remembered he hit the victim with only objects, not his hands, and that the Defendant's friends' telephone numbers were in his cell phone call history.

Detective Gibson testified that when the Defendant was asked how he knew the victim was dead, the Defendant began a sentence in which he "sounded like . . . he was going to say I made sure." She said that the Defendant noted he "threw a dumbbell right through [the victim's] head." She stated that the Defendant answered affirmatively when asked whether he intended to kill the victim when he threw the dumbbell. She said that when Detective Cowan noted the cut on the Defendant's head, the Defendant said, "I was bleeding – it was bleeding and like I don't play games like that." Detective Gibson said that the Defendant stated he had a "bad temper" and that the Defendant agreed with Detective Cowan that he "[got] back" at people who did "things" to him. She stated that the Defendant said he was "mad but I wasn't showing it" before the victim fell asleep and that the Defendant mentioned having talked to the victim about the initial fight.

Detective Gibson testified that in Ms. Pike's house, the living room mantle, photographs hanging on the walls, family photo albums, and "little trinkets and . . . porcelain" were not disturbed. On recross-examination, Detective Gibson said any part of the Defendant's statement could be considered in the context of the entire statement and that the Defendant's statement about the sequence of events comprising the homicide was "very vague."

Dr. Darinka Mileusnic-Polchan, an expert in anatomic and forensic pathology, testified that she performed the victim's autopsy and that she documented multiple cuts and abrasions on the victim's head, including deep lacerations to the forehead that exposed bone, bruises and a deformity of the nose and nasal bridge, fractures on the forehead under one laceration that exposed the brain, and stretch lacerations on the head. She noted that bruises were present in many of the injuries, indicating the victim was alive when the injuries were inflicted, and that some of the injuries did not show bruises, indicating that the injuries were inflicted as the victim became comatose and died. Dr. Mileusnic-Polchan said that she documented petechia on the eyelids, which could have been caused by blunt force trauma, and that the upper and lower jaws and upper palate were broken. She stated that she documented forty-four injuries to the victim's face and that the injuries were caused by different objects.

Dr. Mileusnic-Polchan testified that the victim's left arm contained cuts and abrasions, including a "pattern lesion" that showed some evidence of healing, which could have occurred hours or one day prior to the victim's death. She said that the hands showed defensive injuries to the forearms and hands, including abrasions and bruises,

that the right shoulder had "substantial" contusions, and that the lower extremities showed a cluster of minor contusions. Autopsy photographs of the victim were received as an exhibit.

Dr. Mileusnic-Polchan testified that the victim was sixty-eight inches tall and weighed 214 pounds. She said that fragments of ceramic, porcelain, and wood were found in the "head area" of the comforter in which the victim was transported, and that she removed some fragments from the head and neck lacerations. She noted that due to the severity of the trauma to the victim's head, visual identification was impossible and that the victim was identified by his fingerprints. Dr. Mileusnic-Polchan said that the injuries were concentrated on the left side of the head and the right shoulder and arm, which could indicate movement from the victim or the attacker. She stated that the sides of the brain "had multiple impacts," that the top of the brain was not injured, that the top of the head contained some cuts and abrasions, and that the back of the body was uninjured. She said blood coming from the ears indicated that the base of the skull was fractured. She stated that the injuries were consistent with the victim's lying on his back when he was assaulted. She said that any of the head lacerations could have produced the amount of blood necessary to result in blood spatter on the walls and that the blood spatter would have come from the assailant moving an object, not directly from the injuries.

Dr. Mileusnic-Polchan testified that the bloodstained dumbbell could have caused some of the victim's injuries. She said that based upon the amount of blood on the pillow sham, she concluded that the victim could not have placed the pillow on top of his legs. She said that the cause of death was cranial cerebral injuries and that the manner of death was homicide.

Dr. Mileusnic-Polchan testified that the victim's urine was positive for amphetamines, that his blood was negative for drugs, and that the absence of drugs in the victim's blood indicated the amphetamines were taken up to one day before the victim's death. She said that his blood alcohol content was 0.21%. On cross-examination, Dr. Mileusnic-Polchan stated that she collected anal swabs from the victim and sent them to the TBI for analysis. She said that she was aware the victim and the Defendant had an altercation and that she was not told the Defendant had significant injuries such that some of the bruises on the victim's hand could have been caused by striking the Defendant. She agreed that the combination of an assault and the presence of semen inside the victim raised concerns about a possible sexual assault. She agreed that she documented a one and one-half inch superficial contusion on the victim's penis and that the injury occurred around the same time as the other injuries, but she said that in the context of the victim's cranial injuries, it was not important.

-21-

Dr. Mileusnic-Polchan testified that a person would attempt "mechanically" to protect his head and that there were different states of being awake. She said that the distance blood spatter traveled depended upon a number of variables, that the blood spatter on the end of the couch farthest from the victim's head came from an object, and that other evidence indicated the victim did not move from the couch during the attack.

Upon this evidence, the jury found the Defendant guilty of first degree murder. The Defendant was sentenced to life imprisonment. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his first degree premeditated murder conviction. The Defendant does not dispute the evidence establishing that he killed the victim and only argues that the evidence is insufficient to prove beyond a reasonable doubt he acted with premeditation. He argues that the act of killing the victim was a "spontaneous eruption of violence" resulting from the Defendant's rage at having been assaulted by the victim earlier in the evening. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given to the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2014), 39-13-202(a)(1) (2014). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2010) (amended 2011, 2014) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d) (2014). "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Our supreme court has provided a list of factors which "tend to support the existence" of premeditation and deliberation. *See Bland*, 958 S.W.2d at 660. The list includes the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Id.* (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1997)).

The Defendant argues that he acted out of rage provoked by the earlier assault and should have been convicted of voluntary manslaughter. He states in his brief, "Despite a temporary calming of that anger, the rage lingered on and then erupted into an act of spontaneous irrational violence." We note that a person commits voluntary manslaughter when the person kills another "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a) (2014). In contrast, premeditation is "an act done after the exercise of reflection and judgment." *Id.* § 39-13-202(d) (2014).

In the light most favorable to the State, the record reflects that after a night of heavy drinking, the Defendant and the victim fought and that the victim punched the Defendant in the face, leaving a knot on his forehead and a small gash. The Defendant called 9-1-1 at 2:27 a.m. seeking the victim's removal from Ms. Pike's house and while speaking to the dispatcher, the Defendant shouted at the victim that he would kill him. The Defendant called 9-1-1 again at 2:46 a.m. and told the dispatcher the victim had left the house. The Defendant spoke with sheriff's deputies around 3:00 a.m., and Deputy Monroe testified that the Defendant was polite but angry about the fight. At some point, the Defendant called the victim and urged him to return with the Defendant's cell phone. When Mr. Kuzne, Mr. Wallace, and Mr. Merrell returned to the house about 3:30 a.m.,

-23-

the victim was present. They asked the Defendant about the fight, and the Defendant did not allow them to speak to the victim. The Defendant assured them that he was not angry and would not fight with the victim when they left. Mr. Kuzne testified that the men spent time using a computer and had a push-up contest. According to Mr. Merrell, the Defendant urged all of the men but the victim to leave and insisted that the victim stay overnight. The men left the house around 4:00 a.m., and at 5:37 a.m., the Defendant left a voicemail message for his girlfriend stating that he had killed someone and was going away for a long time. At 8:17 a.m., the Defendant called 9-1-1 from Krystal and stated that he had killed someone and wanted to turn himself in to the police. The Defendant told Detectives Gibson and Cowan that he killed the victim by throwing a barbell "through his head" and that he killed the victim because the victim had hit him. The victim was unarmed, was dressed for sleeping, and was wrapped in a comforter on the sofa when his body was found. Dr. Milusenic-Polchan testified that the victim was killed due to cranial cerebral injuries, that she documented defensive wounds and forty-four injuries to the victim's face, and that the evidence indicated the victim had not moved from the sofa during or after the attack. The crime scene photographs depicted a brutal and bloody killing that disfigured the victim to the point that identification was made by fingerprints. In addition, the Defendant stated that after he killed the victim, he destroyed Ms. Pike's house in a rage, but the crime scene photographs show that he left certain items like the china cabinet and family photographs untouched.

The evidence is sufficient for a reasonable jury to find that after the Defendant and the victim fought, a cooling-off period occurred between the victim's leaving the house after the 2:27 a.m. 9-1-1 call and 4:00 a.m., when Mr. Wallace and Mr. Merrell left. The Defendant declared during the 9-1-1 call that he would kill the victim. The Defendant stated that he called the victim and asked him to return to the house. The Defendant acted normal when the other men arrived at Ms. Pike's house around 3:30 a.m. and assured them that he did not intend to fight with the victim after they left. The Defendant insisted that the other men leave and that the victim stay. The Defendant waited for the victim to lay down to go to sleep and then beat him to death with various household items. The victim sustained forty-four injuries to his face alone. *See State v. Sims*, 45 S.W.3d 1, 8 (Tenn. 2001) (noting that evidence of repeated blows "evidencing the particularly brutal nature of the killing" are relevant to establishing premeditation, although such evidence, standing alone, is not dispositive). The Defendant said that he destroyed his grandmother's house because he was "so distraught," but the crime scene photographs showed that he left items of particular sentimental value undamaged. The arresting deputies and Detectives Gibson and Cowan described the Defendant as calm, and the recording of the 8:17 a.m. 9-1-1 call was consistent with their testimony. The Defendant told the detectives that he meant to kill the victim and that he "[got] back" at people who upset him. The jury, by its verdict, rejected the defense theory that the

Defendant was in a continuous state of passion after the fight with no opportunity to cool off and to reflect before killing the victim. We note that the jury was provided an instruction on voluntary manslaughter as a lesser included offense of first degree murder. The evidence is sufficient for a reasonable jury to have found beyond a reasonable doubt that the Defendant acted with premeditation. The Defendant is not entitled to relief on this basis.

## II

### Motion to Suppress

The Defendant contends that the trial court erred by denying his motion to suppress the evidence of inculpatory statements he made to Detectives Gibson and Cowan, arguing that the Defendant was questioned after he invoked his right to remain silent. The State responds that the Defendant did not unequivocally invoke his rights and that as a result, he effectively waived his rights by speaking to the detectives.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

At the suppression hearing, Deputy Capley provided testimony similar to his trial testimony. He said that he did not hear the Defendant's stating he did not want to answer questions, that Deputy Capley asked the Defendant whose blood was on his clothes, and that the Defendant answered him. Deputy Capley stated that he did not ask the Defendant further questions. Deputy Capley said that the Defendant was nervous, shy, and "wasn't sure how to approach us with the information that he needed to tell us." Deputy Capley stated that the Defendant answered questions and did not seem to be

intoxicated or impaired. Deputy Capley said that other deputies entered Ms. Pike's home because they were concerned a possible victim needed medical attention.

On cross-examination, Deputy Capley testified that he did not give the Defendant a waiver of rights form when he and Deputy Morgan arrested the Defendant. On redirect examination, Deputy Capley said that he was not responsible for interrogating the Defendant and that he asked the Defendant questions in order to ascertain whether a victim needed medical attention.

Deputy Morgan provided testimony similar to his trial testimony. He said that he did not carry waiver of rights forms in his police cruiser and that generally, he did not have people sign waiver of rights forms when he arrested them in the field. He agreed that he generally recited the *Miranda* rights verbally when he arrested someone. Deputy Morgan said that when he approached the Defendant, he was already handcuffed and that after Deputy Morgan recited the *Miranda* rights and asked if the Defendant wanted to talk to the deputies, the Defendant "stated, no . . . it was a real quiet no, like he wasn't really sure what he wanted to do." Deputy Morgan stated that due to the amount of blood and "biological matter" on the Defendant's clothes, the deputies were concerned about a potential victim. Deputy Morgan said that he helped perform a security sweep of Ms. Pike's house, that no one other than the victim was present, and that the deputies left the house and secured it as a crime scene. Deputy Morgan stated that he transported the Defendant to the police station, that the Defendant was quiet and shy during the drive, and that Deputy Morgan did not question the Defendant.

On cross-examination, Deputy Morgan testified that in the police cruiser recording, Deputy Morgan stated, "You're not willing to talk to me?" after the Defendant responded to Deputy Morgan's reading his *Miranda* rights. Deputy Morgan did not remember whether he told other responding deputies that the Defendant said he did not want to answer questions. Deputy Morgan agreed that informing other deputies would have been important. On redirect examination, Deputy Morgan stated that at the time he spoke with the Defendant, any questioning was done to determine the welfare of the Defendant and a potential victim.

Detective Clyde Cowan provided testimony similar to his trial testimony. When asked whether the Defendant had been read his *Miranda* rights, Detective Cowan responded that Detective Gibson read them to the Defendant. On cross-examination, Detective Cowan denied speaking to Deputies Capley and Morgan before interviewing the Defendant. Detective Cowan agreed that if another officer would have told him the Defendant was read his *Miranda* rights and said he did not want to speak to the police, Detective Cowan would not have questioned the Defendant. Detective Cowan denied

that the Defendant posed no flight risk when he was interviewed. Detective Cowan said that the Defendant did not have to sign a waiver of rights in order to be informed of his *Miranda* rights. Detective Cowan stated that he did not have contact with Deputies Morgan and Capley at the crime scene. Detective Cowan said that when he was at the crime scene, he did not attempt to contact the deputies who had responded to the Defendant's assault call earlier in the morning because the deputies were off duty. Detective Cowan stated that the Defendant "didn't remember the most important parts of the night, but he did have memory of other parts." Detective Cowan denied that the Defendant said the victim had sexually assaulted him and said that although the Defendant stated, "[The victim] f----- me," Detective Cowan interpreted the Defendant's meaning to be non-sexual. Detective Cowan did not know that the victim had semen in his anus. Detective Cowan agreed that the Defendant told him he had been intoxicated the previous night. Detective Cowan said that the Defendant's statements relative to his memory were contradictory, that the Defendant's stating he could not remember the night's events did not concern Detective Cowan, and that "[it] gave me some pause as to whether or not he was being truthful."

Detective Cowan testified that he did not smell alcohol on the Defendant, that he was aware of the Defendant's previous 9-1-1 call, and that he did not remember which deputy told him about the 9-1-1 call. Detective Cowan said that he did not think the Defendant needed medical attention for the cut on his head and that the cut was not bleeding. On redirect examination, Detective Cowan agreed that the Defendant said he did not think he had been read his rights.

Detective Gibson gave testimony consistent with her trial testimony. She said that she had worked previously as a jail intake officer, that a medical evaluation was always performed at intake, and that if a person were injured, intoxicated, or in the process of alcohol detoxification, the person would be sent to the hospital and not accepted by the jail. She stated that the Defendant was not hospitalized after his arrest. She said that in her opinion, the Defendant's statement was voluntary.

On cross-examination, Detective Gibson testified that she wrote on the waiver of rights form and that she asked Detective Cowan at the time of the Defendant's interview whether they should have the Defendant sign the form. She said that when she asked Detective Cowan if they should "still" have the Defendant sign the form, she referred to the general policy of keeping people restrained in the back of police cruisers, not to a previous conversation. She stated that she was aware Deputy Morgan read the Defendant his rights earlier in the morning and that she was unaware the Defendant had stated he did not want to speak to the police.

-27-

Recordings from Deputy Capley's and Deputy Morgan's police cruisers were received as exhibits, and the trial court noted that it had reviewed the recordings.[1] In the recordings, Deputy Capley pulled up to a Krystal restaurant and a man standing near a large pole turned around and put his hands up. Deputy Capley approached the man and asked if he was injured and if he had any weapons. The man responded that he did not, and Deputy Capley handcuffed him. Deputy Morgan and another deputy approached, and Deputy Morgan read the Defendant his *Miranda* rights. Deputy Morgan asked the Defendant if he was willing to talk to him, and although the Defendant's answer was not audible, Deputy Morgan said, "You're not willing to talk to me?" When asked whether the Defendant wanted to tell the deputies what happened, the Defendant said, "Not really." Deputy Morgan said that it would be better for the Defendant if he told them what happened. A female deputy asked if the Defendant had something to show them. The Defendant said he had nothing to show them. One of the deputies stated that the Defendant had called 9-1-1 saying he had something to tell them and that if another person's blood was on his clothing, the person likely needed help. Deputy Capley asked the Defendant if the blood was his, and the Defendant responded that it was his friend's blood. The Defendant told the deputies that he had gotten into a fight with his friend and that his friend was dead. The police cruisers drove to Ms. Pike's house, and the Defendant cried during the drive.

The recording from Deputy Morgan's police cruiser reflects that the Defendant was handcuffed and read his rights at 8:24 a.m., that the Defendant said he did not want to talk at 8:25, and that the Defendant was asked questions at 8:25, 8:27, and 8:29 relating to the identity and location of the victim and Ms. Pike. The audio temporarily ended at 8:33 a.m., and when the sound is heard again at 8:34 a.m., the Defendant was speaking about the location of the victim's body. The Defendant asked Deputy Morgan if they would be at the crime scene long. At Deputy Morgan's supervisor's request, the Defendant was questioned briefly at 8:41 a.m. about his relationship with the victim. At 8:48 a.m., the Defendant was asked about Ms. Pike's location. The audio temporarily ended again, and when the sound is heard at 8:56 a.m., the Defendant was answering questions about his having used the telephone at Krystal. When Deputy Capley pulled up to Ms. Pike's house, a female voice was audible stating that the Defendant had what appeared to be brain matter on his clothing. The deputies' supervisor arrived and after Ms. Pike's house had been secured, the supervisor asked the deputies what happened when they encountered the Defendant. One of the deputies told the supervisor the Defendant had been read his *Miranda* rights.

---

[1] The prosecutor noted that she did not intend to introduce these videos or the Defendant's statements to Officers Capley and Morgan as trial exhibits.

In the recordings, Detective Cowan arrived at 9:00 a.m. and asked a group of deputies who made first contact with the Defendant. Deputies Capley and Morgan responded that they had and that the Defendant said he did not want to talk to them. Detective Cowan asked the deputies to recount how they encountered the Defendant, and they told him that the Defendant raised his hands, the deputies handcuffed him, and they had "[M]irandized" him.

The trial court denied the motion to suppress. The court found that the Defendant initiated the encounter with the police, that the Defendant told the 9-1-1 dispatcher that he had killed a man and wanted to turn himself in to the police, and that "[it's] difficult to conceive of how more clearly he could waive his right to remain silent." The court found that the Defendant's telling Deputy Morgan he did not want to talk to him was not a clear and unequivocal assertion of the right to remain silent. The court noted, "We all do things we don't want to do. We do them because we know they're right and we should do them." The court found that the Defendant was not compelled to give his statement but was "impelled by his own sense of what he had to do because of what he had done." The court found that the Defendant "clearly showed that it was his will to be taken into custody. He asked for it." The court found that the State had proven by clear and convincing evidence that the Defendant's rights were not violated.

The United States and Tennessee Constitutions dictate that a person shall not be compelled to give evidence against himself. U.S. Const. amend V; Tenn. Const. art. 1, § 9; *see State v. Berry*, 141 S.W.3d 549, 576 (Tenn. 2004). As a predicate to admissibility of a confession, the police are required to inform an individual in custody and subject to state-initiated questioning of his Fifth Amendment rights. *Miranda v. Arizona*, 384 U.S. 436 (1966). *Miranda* protections extend to custodial interrogations, which is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). This court has said, however, "[Q]uestioning initiated by the accused is not interrogation in the *Innis* sense." *State v. Land*, 34 S.W.3d 516, 524 (Tenn. Crim. App. 2000); *see Edwards v. Arizona*, 451 U.S. 477, 484 (1981). Once a person in custody indicates "in any manner" that he wishes to remain silent, questioning must cease unless the person initiates further conversation with the authorities. *Miranda*, 384 U.S. at 474; *see State v. Crump*, 834 S.W.2d 265, 269 (Tenn. 1992).

We conclude that the trial court erred by applying an incorrect standard of law in rendering its decision. No legal authority supports the trial court's assertion that the Defendant waived his right to remain silent by calling 9-1-1 and surrendering to the police. Likewise, the Defendant's calling 9-1-1 and confessing to killing a person did not make his later refusal to waive his right under *Miranda per se* equivocal, as the court's reasoning suggests. *Miranda* established that once the required warnings are given, a defendant has the right to invoke his right to remain silent at any time before or during custodial questioning. *See Miranda* 384 U.S. at 473-74; *Crump*, 834 S.W.2d at 269. No legal distinction exists when a defendant surrenders to the police. Moreover, waiver of one's liberty interest cannot reasonably be said to imply waiver of the right against self-incrimination.

In addition, we note that the trial court did not explicitly credit the witness testimony in its findings; however, the testimony of the deputies and Detective Cowan conflicted with the police cruiser recordings relative to the amount of questioning that occurred and whether Detective Cowan knew the Defendant had previously invoked his right to remain silent, facts relevant to the suppression issue. The deputies testified that after the Defendant said he did not want to talk to them and they ascertained the location of the victim, they stopped asking questions. The recordings reflect that the Defendant was questioned every two to eight minutes between the time he was arrested and the time Detective Cowan began his interview. The recordings also contradict Detective Cowan's suppression testimony that he did not interact with Deputies Morgan and Capley upon his arrival at the crime scene. Moreover, the police cruiser recordings reflect that Detective Cowan was told the Defendant had been read his *Miranda* rights and had told the deputies he did not want to talk to the police. Nevertheless, Detective Gibson, in Detective Cowan's presence, advised the Defendant of his *Miranda* rights again, and Detectives Cowan and Gibson questioned the Defendant about the killing. Detective Gibson's lack of knowledge of the Defendant's invoking his right to remain silent is irrelevant to whether the Defendant did, in fact, previously invoke his right. *See Crump*, 834 S.W.2d at 269 (holding that questioning was improper even though the questioning officer was unaware of a defendant's previous invocation of the right to remain silent). Once a law enforcement officer has knowledge that a defendant has been read his *Miranda* rights and has declined to speak with the police, that officer should not participate in the questioning of that defendant or allow another officer to do so. Although the Defendant did not remember whether he had been read his *Miranda* rights, no legal authority states that it is an accused's burden to inform law enforcement that he has invoked his right to remain silent.

We conclude that the record preponderates against the trial court's finding that the Defendant did not unequivocally invoke his right to remain silent. We note that the

court's finding was based primarily upon the Defendant's surrendering himself to the police voluntarily, which we have addressed above. The record reflects that after being read his *Miranda* rights, Officer Morgan asked the Defendant, "Do you want to talk to me?" Officer Morgan testified at the suppression hearing that the Defendant answered, "No." Although at the hearing, Officer Morgan characterized the Defendant's tone as "uncertain," at the crime scene, Officer Morgan told Detective Cowan that the Defendant said he did not want to talk to the police. The critical inquiry is whether the Defendant did, in fact, invoke his right to remain silent.

Two cases, *Michigan v. Mosley*, 423 U.S. 96 (1975), and *State v. Crump*, 834 S.W.2d 265 (Tenn. 1992), are instructive. In *Mosley*, the defendant was arrested in connection with a robbery and read his *Miranda* rights, and he told the police he did not wish to speak to them. At least two hours later, a different police officer took the defendant to a different floor of the police station, read his *Miranda* rights again, and questioned him about a separate killing. The defendant sought to suppress incriminating statements he made during the second interrogation. The United States Supreme Court concluded that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104 (quoting *Miranda*, 384 U.S. at 479). The Court held that the defendant's rights were scrupulously honored when, upon request, the first officer immediately ceased interrogation and did not resume questioning or try to persuade the defendant to change his mind, an interval of more than two hours passed, and the second officer took the defendant to a different location and, after giving a new set of *Miranda* warnings, questioned the defendant about a "crime different in nature and in time and place of occurrence[.]" *Id.* at 104-05. The Court noted,

> This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.

*Id.* at 105-06.

In *Crump*, our supreme court held that a defendant's rights were not scrupulously honored when "[t]hirty minutes after responding to *Miranda* warnings with 'I don't have anything to say,' [the defendant] was taken on a 30 to 45-minute drive and questioned

while retracing the route of his escape." *Crump*, 834 S.W.2d at 269. The court determined that although the questioning officer was unaware of the prior invocation of the right to remain silent and the defendant agreed to accompany the officer on the drive, the questioning was an "impermissible resumption" of the interrogation and that the statements should have been suppressed. *Id*.

The present case bears more resemblance to *Crump* than to *Mosley*. The Defendant said he did not want to talk to the deputies, the deputies continued asking questions about the blood on the Defendant's clothing, and the Defendant said that the blood belonged to a friend with whom the Defendant fought and that the friend was dead. The deputies drove the Defendant back to the crime scene. The police cruiser recordings reflect that every two to eight minutes, the deputies asked the Defendant further questions.[2] Although most of the questions pertained to public safety—the location of the victim and Ms. Pike—some of the questions did not, and no sustained cessation of questioning occurred. After Deputy Morgan told Detective Cowan that the Defendant had been read his *Miranda* rights and said he did not want to talk to them, Detective Cowan and Detective Gibson questioned the Defendant. The interrogation at the crime scene occurred approximately forty minutes after the Defendant invoked his rights, and the questions pertained to the subject matter the Defendant did not wish to discuss. Although there is no evidence the police intentionally prolonged questioning in an attempt to "wear down his resistance," the Defendant's right to remain silent was not scrupulously honored.

When a violation of *Miranda* occurs, this court must decide whether the violation "merely violated *Miranda's* procedural rules or violated the defendant's constitutional rights." *Crump*, 834 S.W.2d at 270 (citing *Oregon v. Elstad*, 470 U.S. 298, 306 (1985), and *State v. Smith*, 834 S.W.2d 915 (Tenn. 1992)). If a constitutional violation occurred, this court must determine the voluntariness of subsequent statements and whether the statements were "fruit of the poisonous tree" obtained as a result of the violation. *Crump*, 834 S.W.2d at 270 (citations omitted). "Once an individual invokes his right to remain silent and the police fail to honor that invocation by continuing to interrogate him, that violation, by definition, is of constitutional magnitude." *Id*. (citations omitted). When determining the voluntariness of a confession, this court considers the totality of the circumstances and "whether the conduct of the law enforcement officers was such to undermine the accused's free will and critically impair his capacity for self-determination so as to bring about an involuntary confession." *Id*. (citing *Elstad*, 470 U.S. at 318, *State*

---

[2] We acknowledge that the Defendant asked Deputy Morgan how long they would be at the crime scene; however, this is not sufficient to conclude that the Defendant indicated he wished to waive his right to remain silent.

*v. Kelly*, 603 S.W.2d 726, 728-29 (Tenn. 1980), *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).  In *Crump*, our supreme court applied the factors set out in *Smith* to determine whether the defendant's statements after he invoked his right to remain silent were voluntary.  *Id.*  The *Smith* factors were articulated in the context of an initial, unwarned confession, subsequent *Miranda* warnings, and a second confession.  *See Smith*, 834 S.W.2d 915.  As applied in *Crump*, the factors generally consider the following:

> 1. The use of coercive tactics . . . the causal connection between the illegal conduct and the challenged, subsequent confession;
>
> 2. The temporal proximity of the prior and subsequent confessions;
>
> 3. The reading and explanation of *Miranda* rights to the defendant[;]
>
> 4. The circumstances occurring after the arrest and continuing up until the making of the . . . confession including, but not limited to, the length of the detention and the deprivation of food, rest, and bathroom facilities;
>
> 5. The coerciveness of the atmosphere in which any questioning took place including, but not limited to, the place where the questioning occurred, the identity of the interrogators, the form of the questions, and the repeated or prolonged nature of the questioning;
>
> 6. The presence of intervening factors including, but not limited to, consultations with counsel or family members, or the opportunity to consult with counsel, if desired;
>
> 7. The psychological effect of having already confessed, and whether the defendant was advised that the prior confession may not be admissible at trial;
>
> 8. Whether the defendant initiated the conversation that led to the . . . confession; and
>
> 9. The defendant's sobriety, education, intelligence level, and experience with the law, as such factors relate to the defendant's ability to understand the administered *Miranda* rights.

*Smith*, 834 S.W.2d at 919-20; *See Crump*, 834 S.W.2d at 270.

In this case, the Defendant's statement to the detectives was a direct result of Detective Cowan's failure to scrupulously honor the Defendant's prior invocation of his right to remain silent. The inculpatory statement was made to the detectives about forty minutes after the Defendant invoked his right to remain silent. Detective Gibson read the Defendant his *Miranda* rights again before the Defendant made the statement. The questioning took place at the crime scene when the Defendant was handcuffed in the back of a police cruiser and lasted for about forty-five minutes. We note that the Defendant's requests for the questioning to be brief and to move to a more private location were respected and that Detectives Cowan and Gibson asked the Defendant whether he understood his rights. The Defendant did not have access to family members until after the questioning was finished, and he did not request counsel. The Defendant had already admitted in response to the deputies' questions that the victim was dead, and although the Defendant said he did not want to talk to the deputies, he had been asked questions every two to eight minutes. The Defendant did not initiate the conversation that led to his statement to the detectives. The Defendant had a high school education, was literate, and stated that he understood his rights.

We conclude that the Defendant's confession was not voluntary. After the Defendant invoked his right to remain silent, no sustained cessation of questioning occurred. The deputies questioned the Defendant every two to eight minutes, including evidence-gathering questions about his relationship with the victim and about his using the telephone at Krystal. As a result of the questions, the Defendant said that he and a friend fought and that the friend was dead. The interview with the detectives occurred about forty minutes after the Defendant invoked his right to remain silent. Detective Cowan was told that the Defendant had been read *Miranda* rights and had said he did not want to talk to the deputies, but Detective Cowan allowed Detective Gibson to administer *Miranda* warnings a second time, and Detective Cowan asked the majority of the questions during the interview. Although Detective Gibson read the Defendant *Miranda* warnings a second time and the Defendant said that he understood his rights, the Defendant's first invocation of his right to remain silent had not been honored, and a cumulative coercive effect existed based upon the deputies' and detectives' actions. As a result, the State did not prove by a preponderance of the evidence that the Defendant voluntarily waived his right to remain silent, and his statement to the detectives should have been suppressed. *See State v. Bush*, 924 S.W.2d 489, 500 (Tenn. 1997) (holding that at a suppression hearing, the State must prove a valid waiver of *Miranda* rights by a preponderance of the evidence.)

However, we conclude that the error was harmless beyond a reasonable doubt in light of the overwhelming evidence of the Defendant's guilt. "The erroneous admission of evidence obtained in violation of a defendant's *Miranda* rights is a non-structural

constitutional error, and as such, is subject to . . . harmless error analysis." *State v. Climer*, 400 S.W.3d 537, 569-70 (Tenn. 2013). The State bears the burden of demonstrating beyond a reasonable doubt that a non-structural constitutional error did not contribute to the guilty verdict. *Id.* (citing *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)). Even if the Defendant's statement to the detectives had been suppressed, the record reflects that the Defendant said in the 2:27 a.m. 9-1-1 call that the victim had hit him and that he argued with the victim and threatened to kill him. Mr. Merrell, Mr. Kuzne, and Mr. Wallace testified that the Defendant and the victim had fought before their arrival at Ms. Pike's house, that the Defendant acted strange and calm about the fight, that the Defendant urged the men to leave and the victim to stay, and that the Defendant stated he would not fight the victim after the men left. The Defendant and the victim were alone beginning at 4:00 a.m. when Mr. Merrell and Mr. Wallace left. The victim was found lying on his back on the sofa. Dr. Milusenic-Polchan testified that the victim was wrapped in a comforter, that he was dressed for sleeping, and that no evidence indicated he had moved during the attack. Multiple objects found around the sofa, including a heater and twenty- and sixteen-pound dumbbells, were covered in the victim's blood. The victim sustained forty-four injuries to his face and had defensive wounds on his hands. *See Sims*, 45 S.W.3d at 8. No evidence indicated that the victim was armed. The Defendant called 9-1-1 reporting that he had killed someone. Detective Gibson testified that the Defendant left a voicemail message for his girlfriend stating he had killed someone. The arresting deputies testified about the Defendant's calm demeanor, and the 9-1-1 recording supports the testimony. When the Defendant was arrested, his clothing was covered in the victim's blood. Based upon this evidence, a rational jury could have found beyond a reasonable doubt that the Defendant committed first degree premeditated murder. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE